FILED
United States Court of Appeals
Tenth Circuit

August 15, 2011

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

CORDELL NICHOLS,

　　Defendant - Appellant.

No. 10-3304
(D. Kan.)
(D.C. Nos. 5:08-CV-04116-JAR &
5:02-CR-40098-JAR-1 )

**ORDER DENYING
CERTIFICATE OF APPEALABILITY,
AND DISMISSING APPEAL**

Before **O'BRIEN**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

Cordell Nichols, a federal prisoner proceeding pro se,[1] wants to appeal from the district court's dismissal of his 28 U.S.C. § 2255 motion to vacate, set aside or correct a sentence. The motion alleged that newly discovered evidence revealed numerous instances of ineffective assistance of his counsel, both prior to trial and at sentencing, specifically counsel's failure to properly investigate and to object to *Brady* violations. We deny Nichols' request for a Certificate of Appealability (COA).[2]

---

[1] We liberally construe Nichols' pro se filings. *See Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1187 (10th Cir. 2003).

[2] The district court granted Nichols' motion to proceed *in forma pauperis* on appeal.

## I.    FACTUAL BACKGROUND[3]

Nichols's convictions were based on three separate traffic stop incidents.

A.    Wyoming, 1999

On October 12, 1999, Trooper William Morse of the Wyoming Highway Patrol noticed a car travelling unusually slowly on I-80.  He stopped the car when he saw it weave across the center line of the highway.  The driver, Nichols, was the sole occupant and Morse smelled the odor of burning marijuana as he approached the car.  Nichols produced a fictitious Missouri ID card identifying him as "Charles Rhodes."  He appeared to have loose marijuana scattered over himself and throughout the front seat of the car, as if he had been trying to eat the marijuana in an effort to destroy it.  "Rhodes" told the trooper he was driving from Louisiana to Sacramento, California.  Morse arrested "Rhodes" for possession of marijuana and for suspicion of providing a false name.  A patdown search of Nichols revealed a large roll of cash, ultimately determined to be nearly $13,000, in his front pants pocket.  Nichols claimed to have won the money gambling at a casino but offered nothing to confirm his claim.  A car registration check revealed the owner of the car to be Rafael Navarez of Sacramento, California.

---

[3] The facts are taken from the district court's order denying Nichols' § 2255 petition.  The record on appeal is spare, to say the least.  For example, although Nichols' claims perjured testimony was admitted at both the suppression hearing and at trial, the record does not include transcripts from either proceeding.  Nor does the record include Nichols' earlier motions for a new trial based on alleged *Brady* violations, even though his current claim maintains this is newly discovered evidence.  The record consists only of the Superseding Indictment and the pleadings and attachments from his current § 2255 motion.  A more fulsome record would have aided our review; the record supplied is barely adequate, often leaving us short on details.

Further investigation uncovered Nichols' true name and a false compartment built into the back of each front seat of the car. A check with the casino revealed no record of cash winnings by anyone named Rhodes or Nichols during the relevant time. Ultimately, Nichols pled guilty in Wyoming state court to interference with police, driving under suspension and a lane violation in exchange for dismissal of a marijuana possession charge.

B.      St. Louis, 2000

On September 14, 2000, an informant, Damon Campbell, told agents with the St. Louis DEA Drug Task Force about several individuals, including Nichols, who planned to travel to the San Francisco, California, area to purchase heroin. Campbell described the car and advised agents the group planned to leave at approximately 7:00 p.m. that evening. At approximately 7:15 p.m., agents saw the described car in the area predicted by Campbell. Two officers performed a traffic stop after observing the car speeding and changing lanes without signaling. The officers smelled the odor of marijuana coming from the vehicle and immediately arrested the occupants for possession of a controlled substance. Nichols and his co-defendant, Tristin Mitchell, were passengers. Inside the rented vehicle agents found eight small bags of marijuana and, in Nichols' suitcase, $5,700 in cash.

Based upon interviews conducted after the arrest, agents learned Nichols was using an apartment in St. Louis for the purpose of storing and selling heroin. Agents then went to the apartment and spoke with Nichols' girlfriend, Sheneice Sanders, who leased the apartment and lived there with Nichols. Sanders signed a consent form to search the

apartment. Agents found approximately two ounces of "black tar" heroin, two .380 caliber semi-automatic handguns, two boxes of ammunition for the handguns, numerous items associated with the distribution of heroin, and $2,700 in cash. One of the handguns was found in the same dresser drawer as the heroin. A latent fingerprint, later identified as Nichols' print, was taken from a grinder commonly used to package heroin for distribution. No charges were filed, either in federal court or state court, as a result of this investigation.

C.     Kansas, 2002

At approximately 7:15 a.m. on May 22, 2002, Trooper Mike Weigel of the Kansas Highway Patrol was working I-70 when he saw a passenger car following a recreational vehicle too closely. After checking the distance between the cars several times, Weigel stopped the car. The driver, Tristin Mitchell, stated he did not have a driver's license. The two passengers were Kristin White and Nichols. Nichols falsely identified himself as "Quindell Johnson" and said he did not have a valid driver's license. The rental car agreement showed the car had been rented to "Angela McCauley" for one day on May 15, 2002, in Sacramento, California and it was not to be taken outside of California. White told Trooper Weigel her aunt had rented the vehicle and she had obtained a one-week extension of the rental.

Eventually Weigel told Mitchell he would issue Mitchell a warning for the traffic violation and the license violation, and the three would be free to leave. Weigel then told White she would have to drive since she was the only occupant who had a valid driver's license. Weigel then asked White whether he could ask her some additional questions,

adding that he was finished with the traffic stop. White agreed and Weigel asked whether there were any drugs, guns, or explosives in the vehicle; she said no. Weigel then asked if he could look into the trunk of the vehicle; she said "sure." Upon opening the trunk, Weigel found a sack of marijuana "laying right there in the trunk." He arrested Nichols, Mitchell, and White. A further search revealed several small bags containing marijuana and a large bag containing approximately 4.8 kilograms of heroin. The stop was videotaped and the tape was admitted into evidence at a subsequent suppression hearing.

## II.    PROCEDURAL BACKGROUND

On July 31, 2002, Nichols, White, and Mitchell were indicted in federal court on a single count of possession with intent to distribute approximately 4.6 kilograms of heroin based on their May 22, 2002 arrests.[4] On November 7, 2002, after the DEA agents in Kansas learned of the prior drug trafficking activities of Mitchell and Nichols, the grand jury was asked to and did return a Superseding Indictment which added a count of conspiracy to traffic heroin, running from the time of Nichols' 1999 stop in Wyoming through and including the 2002 arrest in Kansas.[5]

Prior to trial, the court heard Nichols' motions to suppress the heroin seized by Weigel during the Kansas traffic stop and the money, heroin, guns, and paraphernalia

___

[4] This was Nichols' third attorney. Attorney Ronald Wurtz was appointed to represent Nichols on August 8, 2002. On October 2, 2002, Wurtz was allowed to withdraw from representation and Dwight Miller was then appointed. Miller was granted leave to withdraw on November 14, 2002.

[5] One week after the grand jury issued the Superseding Indictment, Miller's motion to withdraw was granted but he continued to appear on Nichols' behalf until attorney James Chappas was appointed on December 23, 2002.

seized in St. Louis. The court denied the motions. Also prior to trial and at Nichols'

request, James Chappas orally moved to withdraw as Nichol's counsel of record. The

court granted the motion but required Chappas to serve as standby counsel.[6] Trial began

on June 2, 2003.

On June 9, 2003, the jury convicted Nichols of one count of possession with intent

to distribute approximately 4.6 kilograms of heroin, in violation of 21 U.S.C. § 841(a)(1)

and one count of conspiracy to distribute in excess of one kilogram of heroin, in violation

of 21 U.S.C. § 846.8. On June 19, Nichols filed motions for appointment of new counsel,

leave to arrest judgment and for a new trial. The court appointed Stephen Kessler, who

represented Nichols at sentencing and through his direct appeal. On September 15, 2003,

judgment was entered sentencing Nichols to 360 months' imprisonment on each count, to

run concurrently, followed by ten years of supervised release.

Nichols' direct appeal argued: (1) evidence seized following the Kansas and St.

Louis traffic stops should have been suppressed because the stops violated the Fourth

Amendment; (2) testimony regarding the Wyoming traffic stop should have been held

inadmissible under Fed. R. Evid. 404(b); (3) a DEA agent's testimony regarding

allegedly threatening statements made by Nichols at the time of his arrest in Kansas

should also have been held inadmissible under Rule 404(b); and (4) there was insufficient

---

[6] Chappas and Nichols were apparently in disagreement regarding Nichols' defense much earlier than Chappas' motion to withdraw because Nichols began filing pro se motions with the court as early as May 7, 2003. During May, Nichols filed eight pre-trial pro se motions in addition to the numerous motions filed by his counsel. All of Nichols' motions were denied or dismissed as moot.

evidence to support his conspiracy conviction.  *See United States v. Nichols,* 374 F.3d

959, 961 (10th Cir. 2004), vacated by 543 U.S. 1113 (2005) (hereinafter "*Nichols I*").  In

*Nichols I*, we rejected each claim and affirmed his conviction and sentence.

On June 7, 2004, while his direct appeal was pending, Nichols filed a motion to

vacate his sentence.  The motion was purportedly brought under § 2255 but was subtitled

as a motion for relief from judgment pursuant to Rule 60 (b)(2), newly discovered

evidence.  The motion contended Weigel falsely testified at the suppression hearing by

saying he had been investigating an injury accident in the early morning hours of May 22,

2002, prior to stopping Nichols and his friends.[7]  The district court denied Nichols'

motion, noting that Rule 60(b) of the Civil Rules of Procedure has no application to a

criminal judgment; it declined to characterize Nichols' motion as a collateral attack under

28 U.S.C. § 2255.

Following the *Nichols I* decision, Nichols filed a petition for writ of certiorari with

the Supreme Court, asking his sentence be vacated based upon *United States v. Booker*.

543 U.S. 220, 245 (2005) (making the Guidelines "effectively advisory").  In January

2005, the Supreme Court granted certiorari, vacated the *Nichols I* opinion and remanded

---

[7] After his trial, Nichols' filed a request under the Freedom of Information Act.
The record does not reveal what he requested but he supplied a copy of a February 17,
2004, Kansas State Patrol letter stating, in part, "Master Trooper Weigel did not
investigate any accidents on the day of May 22, 2002."  (R. at 62.)  Nichol's arrest was at
7:15 a.m.  The record on appeal does not contain Weigel's testimony at trial or at the
suppression hearing, so it is uncertain whether the information from the Kansas State
Patrol contradicts his testimony.  It is even less clear how the accident investigation (or
lack thereof) relates to a material issue in dispute in this case.  In any event it does not
necessarily suggest, as Nichols argues, that Weigel was lying about a material fact –
inaccurate testimony is generally the product of error, not willful misconduct.

for further consideration in light of *Booker*. *See Nichols v. United States*, 543 U.S. 1113 (2005). On remand, our court reinstated its opinion affirming Nichols' conviction and remanded the case to the district court for resentencing. *United States v. Nichols*, 410 F.3d 1186 (2005) ("*Nichols II*").

Following our remand to the district court, Nichols filed a second motion for a new trial, this time pursuant to Rule 33(b)(1) of the Federal Rules of Criminal Procedure. He again accused Weigel of lying about investigating an accident in the early morning hours of May 22, 2002. At his resentencing hearing in March 2006 (Stephen Kessler had again been appointed to represent him), Nichols personally tried to argue his claims for a new trial. Kessler, however, conceded the claims were not properly before the district court on remand for resentencing. In its written order memorializing its findings, the district court discussed the merits of Nichols' Rule 33 motion. It concluded the evidence offered was merely impeaching and did not violate *Brady*.[8] The district court rejected Nichols' objections to certain proposed sentence enhancements, including a two-point enhancement for possession of a firearm, just as it had (and for the same reasons) at his initial sentencing. It again sentenced Nichols to 360 months imprisonment on Counts 1 and 2, to run concurrently. Nichols appealed from the new sentence and we again affirmed, but declined to consider Nichols' *Brady* arguments because "this issue was beyond the scope of this court's remand." *United States v. Nichols*, 219 F. App'x. 770,

---

[8] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

773 (10th Cir. 2007) (*Nichols III*).

Nichols filed this § 2255 motion on October 2, 2008, raising the same *Brady* issues in the guise of numerous claims of ineffective assistance of counsel and prosecutorial misconduct violations. His arguments were based upon the evidence offered at his earlier motion for a new trial. He also submitted two affidavits signed by Damon Campbell, dated August 31, 2004 and October 20, 2004.

Damon Campbell's second affidavit, which was more expansive than his first, stated in relevant part:

> I, Damon Campbell had a pending case at the time, of 9-14 2000. I, Damon Campbell knew Cordell Nichols was leaving for Wyoming to attend a court date in Wyoming, and by me having an extensive record. I manipulated the situation of Cordell Nichols going to Wyoming by telling the named agents there was a drug run that was going to occur. . . .
>
> I was at Shaniece Sanders residence several hours before Cordell Nichols came there. At the time I came there, Cordell Nichols did not know I was there. Ms. Sanders was busy cooking and helping her children with school work in their room. I placed several items throughout the apartment which I do plead the fifth to . . .
>
> [After the traffic stop and arrests]I took the agents to Ms. Sander's residence and showed the agents the apartment; the agents knocked at the door and asked could they talk to Ms. Sanders about a murder that happened in the complex several days ago. Ms. Sanders opened the door up, the agents rushed in, placing Ms. Sanders in handcuffs. I heard her children crying and Ms. Sanders yelling and crying as well. I faded away on the steps and was followed by an agent to my vehicle. . . .
>
> After about 20-30 minutes the agent said I could leave, they had found what they were looking for, like I knew they would, the agent told me, good work and to keep in touch. I don't know exactly what happened after that, cause I was long gone, hoping to be out of sight and out of mind.

(R. at 68-70.) Nichols also provided a letter dated February 17, 2004, from a record manager at the Kansas Highway Patrol stating, "Master Trooper Weigel did not

investigate any accidents on the day of May 22, 2002." (*Id*. at 62.)

On January 1, 2009, Nichols moved to expand the record to include an affidavit

signed by Sheniece Sanders, in which she averred:

> I, Sheneice Sanders was subpoena [sic] to come to court to testify as the prosecution witness during the course of Cordell R. Nichols trial in 2003.
>
> I do not know anything about what Cordell R. Nichols was or was not involved in back then at our time of dating, in 2000 or any other point in time.
>
> I only know what I related to Prosecutors at Topeka, Kansas in 2003 that the agents and officers that came to the residence I and Cordell R. Nichols shared forced there [sic] way into our residence at gun point and threaten [sic] to take me to jail and take away my two children who where [sic] at the residence if I did not agree to sign a consent to search and statement, On [sic] September 14, 2000 at 2126 Empire Ct. In St .Louis, MO. County.
>
> Im [sic] signing authorization for Cordell R. Nichols to have the statements I made to Prosecutors in Topeka, Kansas in 2003 as mentioned above.

(*Id*. at 77.)

The district court granted Nichol's motion to expand the record to include

Sanders' affidavit and in a thorough and detailed order denied § 2255 relief. Nichols

filed a motion for reconsideration complaining that court had not addressed Sanders'

affidavit in its initial order. The court granted the motion to the extent of its alleged

error. However, on reconsideration concluded 1) Sanders' affidavit was not reliable

evidence and 2) the record contradicted Nichols' claim that the evidence was newly

discovered. It also determined Nichols' had not shown prejudice resulting from

counsel's failure to call Sanders as a witness at the suppression hearing because there was

no reasonable probability her testimony (based on her above quoted affidavit) could be

more credible than that of the officers conducting the search.[9]  Therefore, the outcome of the suppression hearing would not have changed.  The court dismissed Nichols' § 2255 motion and denied a COA.  Nichols renewed his request for a COA with this Court.

## III.    DISCUSSION

A COA is a jurisdictional prerequisite to our review of a petition for a writ of habeas corpus.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  We will issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). To make such a showing, an applicant must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted).  In evaluating whether an applicant has satisfied this burden, we undertake "a preliminary, though not definitive, consideration of the [legal] framework" applicable to each of his claims.  *Miller-El*, 537 U.S. at 338.

Although Nichols' request for a COA is difficult to follow, it appears he claims the district court erred in failing to order a new suppression hearing and trial given his evidence that Officer Weigel lied about his activities before he made the traffic stop on May 22, 2002.  In addition, he contends, at the least the court erred in concluding Sanders' affidavit was unreliable without first holding an evidentiary hearing on the allegedly coerced consent to search her apartment.  Nichols claims his counsel was

---

[9] The judge who decided the pre-trial suppression motions also presided over Nichols' post-trial motions.

- 11 -

ineffective for failing to investigate and present the testimony of these witnesses and he was prejudiced because this evidence would have resulted in the suppression of the evidence used to convict and sentence him. He also claims the prosecution's failure to disclose Weigel's false statements and Sanders' claim she was coerced -- the newly discovered evidence -- is a *Brady* violation and, by failing to produce it to the defense, the prosecution engaged in misconduct violating his right to a fair trial.

We have carefully reviewed the record, the district court's orders, Nichols' application for a COA and proposed opening brief. We conclude he is not entitled to relief on either of his claims -- ineffective assistance of counsel or a *Brady* violation. We need not analyze Nichols' every challenge to the district court's extensive orders. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal."). Rather, we go directly to the ultimate issue -- whether Nichols has shown prejudice by the actions of counsel or that of the prosecutors.[10] Like the district court, we conclude he failed to show prejudice on either claim.

To prevail on his ineffective assistance of counsel claims, Nichols must establish two things: an ineffectiveness prong (trial counsel's "representation fell below an objective standard of reasonableness") and a prejudice prong (there is "a reasonable

---

[10] Our analysis is not meant to question the district court's determinations on the reliability of the evidence Nichols' submitted. Rather, efficient disposition of the myriad issues Nichols has raised prompts our approach.

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

"A *Brady* violation has three essential elements: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) (quotations omitted). "Prejudice satisfying the third element exists when the suppressed evidence is material for *Brady* purposes." *Id.* (quotations omitted). "Favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quotations omitted). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quotations omitted).

A.    The St. Louis Evidence; Sanders' Affidavit

Even if we assume 1) defense counsel had not properly investigated the potential testimony from Campbell and Sanders and 2) the prosecution was aware of the substance of their testimony, Nichols was not prejudiced by the failure to suppress the evidence in the St. Louis apartment. The events in St. Louis had nothing to do with the 2002 traffic stop which is the basis for his conviction of possession with intent to distribute heroin. The events in St. Louis relate only to the conspiracy charge. In *Nichols I*, we rejected Nichols' insufficient evidence of a conspiracy argument:

The evidence showed Nichols and Mitchell had known each other for

- 13 -

nearly two years, at least. Mitchell was present in the Land Rover at the time of the St. Louis stop, where marijuana was found in the vehicle, and gave a false name to police at that time. Since Mitchell was from Sacramento, and the confidential informant had reported that the Land Rover was on its way to California, a jury could reasonably infer Nichols and Mitchell planned to travel to Sacramento together on that occasion. At the time of the Kansas stop, nearly two years later, Nichols and Mitchell were again traveling together, this time from Sacramento on the way to St. Louis. Both trips appeared to involve purchasing or transporting heroin for distribution. We believe this evidence, together with the reasonable inferences therefrom, is sufficient to indicate concert of action for the accomplishment of a common purpose.

374 F.3d at 971 (quotations omitted). Critically, we did not rely on any of the evidence retrieved from Nichols' apartment in affirming his conspiracy conviction. Therefore, he has failed to show that, even if the outcome of the suppression hearing were different and the guns, heroin and heroin grinder from the apartment were not admitted, the outcome of his trial would have been different.

Nichols' sentencing would also remain unaffected. A two point enhancement pursuant to USSG § 2D1.11(b)(1) was applied to Nichols' base offense level because of the guns found in his apartment with the heroin. However, even if this evidence were suppressed at trial, it was admissible at Nichols' sentencing. See *United States v. Hinson*, 585 F.3d 1328, 1335 n.3 (10th Cir. 2009) ("The exclusionary rule does not bar the admission of the fruits of an illegal search at sentencing unless the illegal search was conducted with the intent to obtain evidence that would increase the defendant's sentence."). Therefore, his sentence was not increased by defense counsel's failure to successfully suppress the weapons evidence by presenting Sanders' affidavit or testimony.

B.    The Kansas Stop; Weigel's Testimony

Turning to Nichols' allegations regarding Weigel's testimony, he has again failed to show prejudice from any failure by counsel to investigate Weigel's activities earlier on the day of Nichols' arrest.  As duly noted by the district court, immaterial impeaching evidence is not sufficient grounds to order a new trial.  *United States v. Headman*, 594 F.3d 1179, 1184-85 (10th Cir.), *cert. denied*, 130 S. Ct. 3401 (2010).  The reason for the rule is amply demonstrated here.  Assuming Nichols' allegations (Weigel incorrectly testified about investigating an accident prior to the traffic stop on May 22, 2202) are true and the prosecution was aware of the anomaly, the impeaching evidence does not undermine Weigel's relevant testimony.[11]  In any event, Nichols does not explain how mistaken (perhaps even false) testimony regarding Weigel's activities prior to the traffic stop would negate the justification for the stop.[12]  It certainly does not undermine White's videotaped consent to search the trunk *after* the traffic stop was completed.

---

[11] Apparently, Weigel's trial testimony included his statement that, prior to the stop of White's rental car, he was engaged in investigating an accident involving an injury.  In the § 2255 proceedings, Nichols presented a letter from the Kansas Highway Patrol stating Weigel had not investigated an accident that day.  Nichols also recently filed a motion with this court to supplement the record with a report of all accident investigations conducted by Weigel in 2002.  None include an accident report for May 22, 2002.  Nichols claims his new information demonstrates Weigel perjured himself, but it falls far short.  "Perjury occurs when a witness testifying under oath or affirmation gives false testimony concerning a material matter with the *willful intent* to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *United States v. Flonnery*, 630 F.3d 1280, 1287 (10th Cir. 2011) (quotations omitted and emphasis added).  We grant his motion to supplement the record but it does him no good.  There is no reason, on this record as supplemented, to presume Wiegel lied.  The most one could reasonably say is his testimony was apparently erroneous.

[12] Nichols also does not explain what would motivate the officer to deliberately lie about facts preceding this videotaped traffic stop and voluntary consent to search.

- 15 -

No doubt proper impeachment evidence can form the basis for a *Brady* violation. *See United States v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009) ("In the event that the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule.") (quotations omitted). But even if Nichols' newly discovered evidence would place Weigel's credibility at issue, Weigel's testimony about the traffic stop and ultimate consensual search of the car was corroborated by a videotape of the events. And Nichols does not challenge the authenticity or accuracy of that evidence. The lost opportunity to impeach Weigel's immaterial testimony in light of the videotaped corroboration of the material facts will not suffice to undermine our confidence in the jury's verdict.

Nichols' request for a COA is denied and this matter is **DISMISSED**. His motion to supplement the record is **GRANTED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge